IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| ADAM DOUGLAS RIGBY, | ) |
| | ) |
| Plaintiff/Counterclaim Defendant, | ) |
| | ) |
| v. | )  Civ. Act. No.: 1:24-CV-88-TFM-M |
| | ) |
| LONGLEAF MACHINING, LLC, | ) |
| | ) |
| Defendant/Counterclaim Plaintiff. | ) |

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are two motions for summary judgment, Defendant Longleaf Machining, LLC's Motion for Summary Judgment and Brief and Evidentiary Material in Support (Docs. 68, 69, 70, filed 06/30/25) and Plaintiff Adam Douglas Rigby's Motion for Summary Judgment and Brief and Evidentiary Material in Support (Docs. 71, 72, 73, filed 06/30/25).  Each party timely submitted their respective responses and replies.  *See* Docs. 76, 77, 78, 80, 82, 83. Having considered the motions, responses, replies, evidentiary submissions in support of the motions, and relevant law, the Court finds both motions are due to be denied.

**I.      PARTIES AND JURISDICTION**

Plaintiff/Counterclaim Defendant Adam Douglas Rigby ("Plaintiff" or "Rigby") asserts three claims against Defendant/Counterclaim Plaintiff Longleaf Machining, LLC ("Defendant" or "LLM"), for which he seeks equitable and declaratory relief, damages, and attorney fees. Specifically, Plaintiff brings claims for violation of the Stored Communications Act (Count I), violation of the Computer Fraud and Abuse Act (Count II), and invasion of privacy under Alabama law.  *See* Doc. 1.  Defendant asserts counterclaims against Plaintiff under Alabama law for breach of fiduciary duty and duty of loyalty (Count I), tortious interference with business relations and

Page 1 of 17

contracts (Count II), and faithless servant (Count III), and seeks damages, punitive damages, and attorney fees and costs.  The Court has subject matter jurisdiction and venue over this matter pursuant to 28 U.S.C. § 1331 (federal jurisdiction) and § 1367 (supplemental jurisdiction).[1]

The parties do not contest jurisdiction or venue, and the Court finds sufficient support exists for both.

## II.    BACKGROUND

### A.    Factual Background

Defendant is a machine shop located in Brewton, Alabama.  Doc. 69 at 2.  Defendant's business uses computer numerically controlled machines to offer "full-service, precision machining of close tolerance parts" to its clients.  *Id.*  Defendant hired Plaintiff on October 29, 2009, and Plaintiff worked as Defendant's operations manager and quality control manager.  *Id.* at 3; Doc. 73 at 2.  Plaintiff signed a non-disclosure agreement when he became an employee at LLM.  Doc. 69 at 3; Doc. 73 at 2.  Plaintiff disputes the contents of the nondisclosure agreement. *See* Doc. 73 at 2-3.  At the time he was hired, Plaintiff also signed an acknowledgement that he read and understood Defendant's employee handbook.  Doc. 69 at 4.  The employee handbook included policies on general confidentiality obligations, conflicts of interest, conduct standards and discipline, ethical and legal business practices, and investigations. *Id.* at 6-8.

While employed at LLM, Plaintiff was assigned a company-owned and supplied desktop computer workstation.  *Id.* at 9.  The LLM employee handbook provides:

> The Communication and Information Systems at Longleaf Machining LLC should
> be used only for conducting company business. Communication systems include,
> but are not limited to any handheld wireless device such as palm organizers, laptops
> and blackberries or more traditional devices such as phones, facsimle-machines and

---

[1] Defendant's counterclaims arise out of the same facts as Plaintiff's claims and are therefore compulsory counterclaims falling under § 1367.

mailing systems.   Information systems include computers, internet/intranet networks and electronic mail.

Since Longleaf Machining LLC reserves the right to access any personal communication without prior notice, company systems should not be used by employees to transmit any messages or access to any information that they would not want to be viewed or heard by a third party.

Incidental, occasional and infrequent use of the Company's communication and information systems for personal use is permitted so long as such use does not interfere with your work or the work of other employee[s] or with the computer's operations.

The communication and information systems of Longleaf Machining LLC may not be used for any illegal, unethical, destructive or wasteful purpose. Employees should exercise care in personal use of any communication and information systems device and should not expect their use of personal information stored in these systems to be kept private.

*Id.* at 10.  The employee handbook further provides the following policy regarding investigations

of property owned by LLM:

In an effort to safeguard the property of our employees, clients, and Longleaf Machining LLC, the Company reserves the right to inspect property owned and/or supplied by the Company.  Company-supplied property (including but not limited to offices, desks, file cabinets, computers and software, company vehicles, lockers and other storage facilities) are company property and are subject to inspection by managers at any time, with or without notice.  Therefore, employees should have no reasonable expectation of privacy in property owned and/or supplied by the company.

*Id.* at 9-10.

Some of Plaintiff's responsibilities included talking to prospective/recruiting customers, evaluating whether Defendant could profitably assist customers, preparing quotes, and overseeing production.  Doc. 73 at 2; Doc. 69 at 12.  In 2022, Larry Heaton approached Defendant and requested a meeting to discuss a "smart" golf ball product that his son, Brian Heaton, had developed.  Doc. 69 at 13.  During their first meeting, Larry Heaton asked if Defendant could

produce the ball and Defendant told him that their machines could not fixture and cut a golf ball. *Id.*

A few months after their first meeting, Larry Heaton contacted Defendant and requested a second meeting. *Id.* During the second meeting, Larry Heaton asked Defendant to look at his equipment and Defendant agreed. *Id.* In December 2023, Defendant's owner, general manager, and Plaintiff went to Larry Heaton's home together to see his equipment and determine if Defendant could produce the ball. *Id.* at 13-14. During that meeting, Plaintiff and Defendant agreed that Defendant could modify Larry Heaton's equipment to produce the volume that Brian Heaton might need. *Id.* at 14. Defendant was interested in handling the initial production and future mass production that might follow. *Id.* During the meeting, everyone agreed that Plaintiff would return to pick up the equipment and set it up in Defendant's facility. *Id.* It was Plaintiff's job to determine whether Defendant could make the golf ball. *Id.* Plaintiff picked up the equipment and brought it to Defendant's facility on January 19, 2023. *Id.* at 15.

After some time passed without word from the Heatons, Defendant's owner contacted Brian Heaton seeking information regarding the Puttlink golf ball project, but he did not hear back. Doc. 69 at 18. Defendant's owner asked Plaintiff if he had heard anything and Plaintiff responded that the application was not ready yet. *Id.* In June 2023, Defendant terminated Plaintiff after learning that Plaintiff was making the golf balls himself. *See* Doc. 69 at 18-19.

Before terminating Plaintiff, Defendant had its IT servicer "take precautionary measures" regarding the technology access that Plaintiff had. Defendant asserts that it did this because of an issue that Plaintiff had with a former employer. After Plaintiff's termination, Defendant's employees accessed Plaintiff's former computer. There is some dispute about what exactly Defendant accessed on Plaintiff's old computer and how it was accessed. For example, Defendant

asserts that it clicked on a desktop app and was taken straight to Plaintiff's email without being prompted for a password. However, Plaintiff asserts that he logged out of his personal email on his work computer after he was fired, and that he was only logged in on his personal email through the internet browser and not via any application on the computer. Additionally, Defendant asserts that it did not access Plaintiff's Dropbox account. However, Plaintiff asserts that Defendant provided documents in discovery that Plaintiff never accessed on his work computer and that were only accessible in his Dropbox account. There is also some dispute as to whether Defendant truly accessed the emails after terminating Plaintiff, or before.

Regardless, while accessing Plaintiff's personal email on his work computer, Defendant found that Plaintiff had been communicating with Brian Heaton about production of the golf ball. Specifically, on February 8, 2023, Plaintiff emailed Brian Heaton from a personal email address and asked Brian Heaton to send a "ghostwritten" email to Plaintiff's work email address stating that he and his partners have decided to go a different route and that he needs to pick up the equipment from LLM's shop. *See id.* at 16-17. Brian Heaton sent the email to Plaintiff's work email as Plaintiff requested, and Plaintiff then forwarded it to his boss and stated that he would coordinate with Brian Heaton to get the equipment moved. *Id.* at 17. At some point, Plaintiff negotiated an agreement with Brian Heaton to make 1,000 golf balls at a shop on his property for $15,000, and Brian Heaton paid the $15,000 to Plaintiff's company, ARA Designs LLC. *Id.*

After he was terminated, Plaintiff filed with the Alabama Department of Labor for unemployment benefits. *See* Doc. 1 at 3. Plaintiff was denied benefits, and the Alabama Department of Labor informed him that the denial was because he was terminated for violating his non-compete agreement with Defendant. *Id.* The Alabama Department of Labor representation

read excerpts of emails from Plaintiff's private Gmail account that Defendant provided to them. *Id.*

## B. Procedural Background

Plaintiff filed this action with this Court on March 25, 2024, requesting damages and injunctive relief for alleged violations of the Stored Communications Act (Count I), the Computer Fraud and Abuse Act (Count II) and for the Alabama tort of invasion of privacy (Count III), all related to his former employment at termination at LLM. *See* Doc. 1. Defendant timely filed its answer to the complaint. *See* Doc. 4. On August 16, 2024, Defendant filed a motion for leave to file an amended answer and counterclaim, which the Court granted. *See* Docs. 28, 31. Defendant filed its amended answer and counterclaim. Doc. 32. Defendants counterclaim asserts three counts—breach of fiduciary duty and duty of loyalty (Count I), tortious interference with business relations and contracts (Count II), and faithless servant (Count III). *See id.* Plaintiff timely filed his answer to the counterclaims. *See* Doc. 33.

On June 30, 2025 the parties filed the instant motions for summary judgment and briefs and evidentiary materials in support. *See* Docs. 68-73. Defendant argues that it is entitled to summary judgment on all of Plaintiff's claims against it but did not move to summary judgment as to its counterclaims. *See* Doc. 69. Plaintiff argues that he is entitled to summary judgment on all counterclaims asserted against him but did not move for summary judgment as to his claims. *See* Doc. 73. Both parties timely submitted their responses and replies. *See* Docs. 76, 77, 78, 80, 82, 83.

## III.   STANDARD OF REVIEW

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R.

CIV. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "[T]he substantive law will identify which facts are material." *Id.* at 248. At the summary judgment stage, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial." *Id.* at 249. The "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) (citing *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993)). For factual issues to be considered genuine, they must have a real basis in the record. *Id.*

The party asking for summary judgment bears the initial burden of showing the material fact that should be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id*. at 322-23. A party must support its assertion that there is no genuine issue of material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations…admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1). The admissibility of evidence is subject to the same standards and rules that govern admissibility of

evidence at trial. *Clemons v. Dougherty County,* 684 F.2d 1365, 1369 n.5 (11th Cir. 1982) (citing *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 556 (5th Cir. 1980).

"When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir. 1995) (internal quotations omitted)(citing *Celotex*, 477 U.S. at 324). The court must view facts and draw all reasonable inferences in favor of the non-moving party. *Moore v. Reese*, 637 F.3d 1220, 1231 (11th Cir. 2011) (citing *Rosario v. Am. Corrective Counseling Servs., Inc.*, 506 F.3d 1039, 1043 (11th Cir. 2007)). However, to avoid summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted). Conclusory assertions, unsupported by specific facts, presented in affidavits opposing the motion for summary judgment are likely insufficient to defeat a proper motion for summary judgment. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

Finally, Fed. R. Civ. P. 56(e) also provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order." FED. R. CIV. P. 56(e).

## IV.    DISCUSSION AND ANALYSIS

### A.  Defendant's Motion for Summary Judgment

### i.    Count I—Stored Communications Act

Defendant argues that it is entitled to summary judgment on Plaintiff's Stored Communications Act ("SCA") claim.  Defendant makes three arguments as to this claim.  First, Defendant asserts that the SCA does not protect opened and undeleted emails on a web-based email service because such emails are not in "electronic storage" as defined by the SCA.  Second, Defendant asserts that Plaintiff had no expectation of privacy in the emails accessed on his work computer due to company policies.  Third, Defendant argues that Plaintiff has no actual damages attributable to Defendant's alleged violation because Defendant learned of Plaintiff's conduct from Larry Heaton and had already made the decision to terminate him prior to discovering the emails, and because Plaintiff's misconduct, not the emails, were the reason that the Department of Labor denied Plaintiff unemployment benefits.

Plaintiff counters that he accessed two personal email accounts through his web-based Gmail accounts via either his personal phone or the Google Chrome browser, and that he did not download nor save to the computer he used at LLM any emails sent or received through his personal email. He also argues that there were several designs and drawings that he did for PuttLink and saved in his Dropbox account that he never accessed on LLM's computer, but that LLM somehow accessed and produced during discovery.  He further argues that the Alabama Department of Labor read from his personal emails that LLM provided to it to justify the denial of unemployment benefits.

The Court agrees with Defendant's argument in reply that Plaintiff's complaint does not assert an SCA violation for access to his Dropbox account, nor that he was terminated or denied unemployment benefits because of documents found in his Dropbox account.  Thus, any assertion that Plaintiff makes regarding his Dropbox account is irrelevant to his SCA claim regarding

Defendant's access of his personal email accounts.

> The SCA provides:
>
> Anyone who "intentionally accesses without authorization a facility through which an electronic communication service is provided; or . . . intentionally exceeds an authorization to access that facility; and thereby obtains . . . access to a wire or electronic communication while it is in electronic storage in such system" is liable under pursuant to the SCA.

*Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167 (11th Cir. 2017) (citing 18 U.S.C. § 2701(a); *Vista Mktg. v. Burkett*, 812 F.3d 954, 962 (11th Cir. 2016)).  "Electronic Storage" is defined as "(A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (B) any storage of such communication by an electronic communication service for purposes of backup protection of such communication."  18 U.S.C. § 2510(17).

As to Defendant's first argument—that the emails were not in "electronic storage" as defined by the SCA—the law in this circuit on electronic storage is not as clear as Defendant paints it to be.  The case that Defendant cites, *Satori v. Schrodt*, 424 F. Supp. 3d 1121 (N.D. Fla. 2019), was affirmed on other grounds by the Eleventh Circuit, not on any findings regarding electronic storage.  Notably, the Eleventh Circuit explained:

> because Sartori waived his arguments that Schrodt was "without authorization" to access the laptop and the Gmail account, and because we conclude that Schrodt wasn't "without authorization" to access the Skype account, all of Sartori's CFAA and SCA claims necessarily fail. We therefore needn't consider [. . .] whether opened emails are kept in "electronic storage" under the SCA.

*Satori v. Schrodt*, Civ. Act. No. 19-15114, 2021 WL 6060975, 2021 U.S. App. LEXIS 37614, at *9 (Dec. 20, 2021).  Nevertheless, the Court must determine whether Plaintiff's emails were in "electronic storage."

Page 10 of 17

Courts are in agreement that once an email has been opened by the intended recipient, the email is not in "temporary, intermediate storage . . . incidental to the electronic transmission thereof" as contemplated by subsection (A). *Levin v. ImpactOffice LLC*, Civ. Act. No. TDC-16-2790, 2017 U.S. Dist. LEXIS 106480, 2017 WL 2937938, at *3 (D. Md. 2017) (noting the first definition of "electronic storage" in § 2510(17)(A) is "generally understood to cover email messages that are stored on a server before they have been delivered to, or retrieved by, the recipient," and following "the weight of authority that deems 'temporary, intermediate' storage status under § 2510(17)(A) to end when the emails have been delivered and opened by the recipient") (collecting cases, including *United States v. Councilman*, 418 F.3d 67, 81 (1st Cir. 2005) (en banc) ("The first category [in § 2510(17)(A)] . . . refers to temporary storage, such as when a message sits in an e-mail user's mailbox after transmission but before the user has retrieved the message from the mail server."); *Theofel v. Farey-Jones*, 359 F.3d 1066, 1075 (9th Cir. 2004) (collecting cases holding that emails are in "temporary, intermediate storage" when they are stored on an internet service provider's server and are "not yet delivered" to the recipient); *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 114 (3d Cir. 2003) (finding an email that had been successfully sent and received was not in temporary, intermediate storage); *United States v. Cioni*, 649 F.3d 276, 286 (4th Cir. 2011) (noting in dicta in criminal case that "access to unopened e-mails is a requirement for proving a violation of 18 U.S.C. § 2701(a)")); *see also In re DoubleClick, Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 512 (S.D.N.Y. 2001) (looking to legislative history and holding that "temporary, intermediate" storage for purposes of § 2510(17)(A) only applies to "electronic communications stored for a limited time in the middle of a transmission, i.e., when an electronic communication service temporarily stores a communication while waiting to deliver it") (citation and quotation marks omitted).

Whether opened and undeleted emails are in "electronic storage" for purposes of backup protection under subsection (B) is less certain. The Eleventh Circuit has acknowledged the split of authority and "much debate" as to whether such emails are in "electronic storage," but has not yet ruled on the issue. *See Vista Mktg.*, 812 F.3d at 963-64 (holding that it did not matter whether opened emails are in electronic storage for purposes of the SCA because it was undisputed that the defendant reviewed unopened emails, and that unopened emails are in electronic storage for purposes of the SCA); *Brown Jordan Int'l, Inc*, 846 F.3d at 1175-76 (holding that the court could not reach this "issue of first impression" because the argument regarding open versus unopen emails was not presented to the district court and therefore was not properly before the court).

While there is no binding precedent, several other Circuits have held that emails opened by the intended recipient but kept on a web-based server like Gmail do not meet the second definition of "electronic storage" either. For example, the Fifth Circuit held that the SCA does not extend to "information that an individual stores to his hard drive or cell phone." *See Garcia v. City of Laredo*, 702 F.3d 708, 793 (5th Cir. 2012) (citing *Hilderman v. Enea TekSci, Inc.*, 551 F. Supp. 2d 1183, 1205 (S.D. Cal. 2008) ("[E]mails on the laptop computer are not stored 'by an electronic communication service for purposes of backup protection' as required by subsection (B).")). Additionally, the Second Circuit held that emails downloaded onto an employer's computer were stored for a purpose other than transmission or backup protection and therefore were not in "electronic storage" within the meaning of the SCA. *See Yukos Capital S.A.R.L. v. Feldman*, 977 F.3d 216, 232 (2d Cir. 2020). The Eighth Circuit has also held that an email which simply "remained on Gmail's server as a matter of course" did not perform a backup function and therefore was not in electronic storage as defined by the SCA. *See Anzaldua v. Northeast Ambulance & Fire Prot. Dist.*, 973 F.3d 822, 842 (8th Cir. 2015).

Page 12 of 17

On the other hand, the Ninth Circuit has held opened, undeleted emails meet the second definition of "electronic storage" for purposes of the SCA. *See Theofel v. Farey-Jones*, 359 F.3d 1066, 1075 (9th Cir. 2004). The Fourth Circuit has also held the same. *Hatley v. Watts*, 917 F.3d 770, 786 (4th Cir. 2019).

Several lower courts in both this Circuit and others have also weighed in on the issue. For example, a sister court held, after an extensive review of the existing case law, that the SCA does not protect undeleted emails that have already been delivered and opened by the intended recipient because such emails are no longer in "electronic storage" as defined by the SCA. *Sartori v. Schrodt*, 424 F. Supp. 3d 1121, 1132-34 (N.D. Fla. 2019). Another district court distinguished *Theofel*, noting:

> The Ninth Circuit's reasoning here relies on the assumption that users download emails from an ISP's server to their own computers. That is how many email systems work, but a Hotmail account is web-based and remote. Hotmail users can access their email over the web from any computer, and they do not automatically download their messages to their own computers as non-web-based email service users do. Instead, if Hotmail users save a message, they generally leave it on the Hotmail server and return to Hotmail via the web to access it on subsequent occasions.
>
> The distinction between web-based email and other email systems makes *Theofel* largely inapplicable here. As the Ninth Circuit acknowledged in *Theofel* itself, "A remote computing service might be the only place a user stores his messages; in that case, the messages are not stored for backup purposes." *Theofel*, 359 F.3d at 1070. Users of web-based email systems, such as Hotmail, default to saving their messages only on the remote system. A Hotmail user can opt to connect an email program, such as Microsoft Outlook, to his or her Hotmail account and through it download messages onto a personal computer, but that is not the default method of using Hotmail. Thus, unless a Hotmail user varies from default use, the remote computing service is the only place he or she stores messages, and Microsoft is not storing that user's opened messages for backup purposes. . . . In the case of web-based email systems, *Theofel* generally is distinguishable.

*United States v. Weaver*, 636 F. Supp. 2d 769, 772 (C.D. Ill. 2009). Ultimately, the *Weaver* court held that previously opened emails stored by Microsoft for Hotmail users are not in "electronic

storage" for "backup protection" under the SCA.  Numerous cases are in accord.  *See, e.g., Lazette v. Kulmatycki*, 949 F. Supp. 2d 748, 758 (N.D. Ohio 2013) ("Emails which an intended recipient has opened may, when not deleted, be 'stored,' in common parlance.  But in light of the restriction of 'storage' in § 2510(17)(B) solely for 'backup protection,' emails which the intended recipient has opened, but not deleted (and which remain available for later re-opening) are not being kept for the purposes of backup protection."); *Crispin v. Christian Audigier, Inc.*, 717 F. Supp. 2d 965, 987 (C.D. Cal. 2010) (citing *Weaver* with approval and applying it to web-based email messages that were already delivered and opened by the intended recipient); *Jennings v. Jennings*, 401 S.C. 1, 7, 736 S.E.2d 242 (2012) (wherein the Supreme Court of South Carolina held in suit brought by a husband against his wife for reading emails to his girlfriend: "We decline to hold that retaining an opened email constitutes storing it for backup protection under the [SCA]. The ordinary meaning of the word 'backup' is 'one that serves as a substitute or support.' . . . Thus, Congress's use of 'backup' necessarily presupposes the existence of another copy to which this e-mail would serve as a substitute or support.  We see no reason to deviate from the plain, everyday meaning of the word 'backup,' and conclude that as the single copy of the communication, Jennings' e-mails could not have been stored for backup protection.").

Meanwhile, other lower courts have followed the Ninth and Fourth Circuits in finding that opened emails are in electronic storage.  *See, e.g.*, *Bailey v. Bailey*, Civ. Act. No. 07-11671, 2008 WL 324156, 2008 U.S. Dist. LEXIS 8565, at *17 (E.D. Mich. Feb 6, 2008) (determining that emails "received by the intended recipient where they remain stored by an electronic communication service" are covered by the SCA, regardless as to whether they were opened).

The Eleventh Circuit has yet to squarely address the issue as previously noted. Thus with the background of persuasive authority, the Court must decide which application of the law to apply here.

This Court agrees with reasoning of the *Weaver* court and the district court in *Satori*. Congress could have chosen a broader definition for "electronic storage," or could have chosen not to define the term at all. Had the term not been defined, the Court very well may have found that opened and undeleted emails that remain on the email server are in electronic storage. However, Congress did define "electronic storage," and subsection (B) requires that the emails be stored "for purposes of backup protection[.]". *See* 18 U.S.C. § 2510(17)(B). An email stored in the ordinary course is not stored for backup protection. Thus, Plaintiff's emails were not in "electronic storage" as contemplated by the SCA. The Court must apply the statutory definition, and this interpretation fits more squarely with how Congress wrote the statute.

Accordingly, Defendant's motion for summary judgment is due to be granted as to Plaintiff's SCA claim.

### ii.    Count II—Computer Fraud and Abuse Act

Defendant also argues that it is entitled to summary judgment on Plaintiff's Computer Fraud and Abuse Act (CFAA) claim because Plaintiff cannot demonstrate that he suffered a "loss" as defined by the CFAA.

The recover under the CFAA, a plaintiff must show that the defendant (1) intentionally accessed a computer, (2) without authorization or in excess of her authorization, (3) obtained information thereon, and (4) caused him to suffer a loss of at least $5,000.00. 18 U.S.C. § 1030(a)(2)(C), (c)(4)(A)(i)(l). The term "loss" is defined by the CFAA as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damages assessment, and

restoring the data, program, system, or information to its condition prior to the offenses, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service. 18 U.S.C. § 1030(e)(11). The Eleventh Circuit has further interpreted "loss" under the CFAA to include two separate types: "(1) reasonable costs incurred in connection with such activities as responding to a violation, assessing the damage done, and restoring the affected data, program system, or information to its condition prior to the violation; and (2) any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." *Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167, 1174 (11th Cir. 2017).

Plaintiff's only losses claimed in the complaint included the loss of his wages because he was terminated and the loss of unemployment benefits because Defendant provided the emails to the Alabama Department of Labor. Plaintiff also purports to have suffered losses related to his credit rating. None of those purported losses fall into the two types of losses clearly defined by the Eleventh Circuit. Because Plaintiff cannot show that he has suffered a "loss" as defined by the CFAA, his claim for violation of the CFAA must fail.

Accordingly, Defendant's motion for summary judgment is due to be granted as to Count II.

### iii.    Count III—Invasion of Privacy and Defendant's Counterclaims

Because the Court finds that Defendant is entitled to summary judgment as a matter of law as to Plaintiff's federal claims, the Court must decide whether to exercise supplemental jurisdiction over the remaining state law claims, including Plaintiff's invasion of privacy claim and Defendant's three counterclaims. *See* 28 U.S.C. § 1367(c).

This dismissal of all federal claims does not automatically deprive the federal court over supplementary jurisdiction over remaining state law claims. *See Palmer v. Hospital Authority of*

*Randolph Cnty.*, 22 F.3d 1559, 1568 (11th Cir. 1994). However, when federal claims are dismissed prior to trial, the preferred course is for the federal court to decline jurisdiction over the state law claims, especially when the claims can be refiled in state court within thirty days without exposing the state law claims to a statute of limitations defense. 28 U.S.C. § 1367(c) and (d); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). The Court must examine a "host of factors" to determine whether it should decline supplemental jurisdiction over state law claims, including "judicial economy, convenience, fairness, and comity." *Ameritox, Ltd. v. Millennium Labs., Inc.*, 803 F.3d 518, 532 (11th Cir. 2015).

Given that summary judgment is granted in favor of the defendant on all of the federal claims in this matter, the parties are **ORDERED** to file briefs on or before **May 11, 2026** analyzing the factors for the continued exercise of jurisdiction over the state law claim and state law counterclaims.

## V.    CONCLUSION

Accordingly, Defendant's Motion for Summary Judgment (Doc. 68) is **GRANTED in part**. Specifically, the motion is granted as to Plaintiff's federal claims. The motion remains pending as to Plaintiff's state law claim. Plaintiff's motion for summary judgment (Doc. 71) remains pending. The Court will hold ruling on the state law claims in abeyance until it has determined whether to continue exercising supplemental jurisdiction over them.

**DONE** and **ORDERED** this the 4th day of May 2026.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES DISTRICT JUDGE